The City of Tucson's Telecommunications Ordinance has been a disaster. Three out of four wireline providers have been involved in litigation with the City of Tucson over the last half dozen years. This is Qwest's second case involving the ordinance. The ordinance was passed prior to passage of the Telecommunications Act and doesn't even pretend to comply with the provisions of the act as they've been interpreted by this court and City of Auburn and other courts across the country. There are two, I think, essential facts about the posture of this case that I want to highlight. And the first is this. It was the City of Tucson that filed suit against Qwest years ago to enforce its ordinance in the Quo Varento action. And as you noted, Judge Trott, the court, the City of Tucson was attempting to enforce its franchise ordinance and to extract fees from Qwest Corporation. The second fact that I think is critical to that, the City of Tucson didn't amend Chapter 7B until right before the trial court was ready to reach the merits in this case. This case would be very different if prior to filing the City of Tucson had amended that chapter and had not sued Qwest. But these two parties have been engaged in a battle over this ordinance along with several other wireline providers in the city now for five years. I want to just highlight several of the provisions of the telecommunications ordinance that are particularly problematic. One of the most troubling provisions is one that courts across the country have stricken down without exception. And this court in the City of Auburn addressed this issue. And that is the ordinance gives the City Council of Tucson a right to request any information that it deems necessary. And to grant or deny a franchise that's in the best interest of the city. Let me ask you, does that mean, Qwest has this territorial grant of a license for franchises, I think is how you say it? That's right. I mean, I understand what you're saying about the ordinance, but as I understand it from the briefs and whatnot and from the district court judge's order, Qwest is not subject to the licensing requirements today. That's correct. So what's this all about? What it's all about, Your Honor, is that the last minute amendment that Tucson made You know, so what? The question is whether it takes you out of the fire zone that you don't like being in. And on its face, it does. Now you're saying, well, sometime in the future, that may be found to be invalid. Well, courts don't operate on the sometime in the future maybes. I simply don't understand what this case is all about in this respect anymore. If it took Qwest out of the fire zone, we wouldn't be here. But it doesn't. Why doesn't it? And it doesn't because the City of Tucson has been very careful to make sure that that What does that mean, not final? Well, two things. One is the City The First Amendment's not final either, if you want to look at it that way. Well, the City has reserved the right to change that amendment at any time. And in response to Qwest's I don't understand what you mean by has reserved the right. You can change anything, anytime, unless you're barred from doing so by the federal constitution or your state constitution. And that's the problem. Given the history of litigation between these parties in Tucson You're asking us to decide a hypothetical case, if it changes. It's not hypothetical in the sense that this was clearly a litigation tactic to avoid the merits on the eve of a decision. So what? I mean, I hate to use discreet vernacular, but so what? You've got an ordinance now that takes you out of the problem that you don't like being in. I simply don't understand how you can get us to rule on something like that. The one confusing question is why Tucson doesn't agree the way everybody else has. The so what to Qwest, Your Honor, is twofold. One is this question of finality that I've mentioned. When that amendment was passed, we wrote a letter to the City and said, Do you agree that Qwest has a pre-statehood grant? And they wouldn't. And they wouldn't. Right. Now, the other so what is that the amendment itself is unlawful. What the amendment does in the City of Tucson Has it been adjudicated to be unlawful? No, but that's why we're here. And what the amendment does is it creates two tiers of regulation in the City of Tucson. It creates one, for one set of telecom providers today, as we sit here today, they have to pay application fees of up to $7,500 and go through an application process. They have to go through an election process to obtain a franchise. Does Qwest have to go through all of that? Qwest does not today, but when this case was filed, it did. And when Tucson filed the quo warranto action, it did. There's no question that Tucson wants to have it both ways, Your Honor. It wants to be able to enforce this ordinance to extract fees at 5%. How would you, you know, I understand what you're doing on the special legislation thing, but how would you have standing to attack that? Well, we have standing when the case was filed, Your Honor, because I mean to attack the idea that this is special legislation. Because that is It favors you, so you're not damaged by it. Well, we are damaged in the sense that we are not able to get a final resolution on the merits, and that's what we want. We want this dispute settled after five years and two different lawsuits. Whether we win or lose, we want a ruling from this Court Saying what? That this ordinance is unlawful under federal law. Not only as to Qwest, but as to everyone else that's using the city's rights of way. Unlawful because it violates the Arizona Constitution's prohibition against special legislation? No, Your Honor. That the ordinance is unlawful under Section 253. Because it vests unlimited discretion in the city council. Because the election requirement But you want us to rule on the case as though the city had never passed Right. Ordinance 7B-37. That's exactly right. Can we just ignore that and write it out of the analysis? I wouldn't say that the Court ignores it, but I think under the governing case law, the burden is on Tucson, the heavy, formidable burden to show that there is no chance that this dispute will arise again. And Tucson has consistently taken the position that Qwest is subject to this ordinance up until the moment, after two years of litigation, 24 depositions, up until the moment that Judge Teelborg was ready to rule on the merits. You see this all the time. One side sees the train coming and gets off the track. Well, and I know the Court's seen this many times, and the Court's established, I think, a pretty solid body of precedent that these kinds of last-minute tactical amendments, which are designed to avoid the merits, should not be tolerated. And the point I want to make is that Qwest has spent literally millions of dollars in the last five years defending first the Quo Warranto action, which ultimately was in State court and then this Court, and now prosecuting this action. So you'd be satisfied if Tucson somehow in an authoritative manner would stipulate that your territorial franchise is valid? If Tucson would stipulate that the territorial franchise is not only a claim that Qwest makes, but is valid, that Qwest has and will always have a pre-statehood grant to occupy the rights of way. Everybody else seems to have done that. Is there any doubt about that? I mean, really? Absolutely. Alice Globe in Miami stipulates the validity of the territorial franchise. As to Tucson, absolutely there's a doubt about it because we've asked for that very assurance and they've refused to give it to us. And, you know, I want to come back to a point I made that I think is very troubling. What this amendment does is it absolutely defeats the purpose of the Telecom Act. The Act is designed to eliminate discrimination to provide for competitive neutrality. And today in the city you have just the opposite. How can it be right that this Court would let stand an ordinance that subjects some companies to a 5% fee, others paying 3.5%, others paying 2%, some companies paying $7,500 applications. Eliminated by a victory in your terms in this case. Absolutely. How? Because as this Court said in the city of Auburn, if the ordinance is unlawful under Section 253, it's unlawful not only as to the plaintiff but all other companies as well. It's preempted by federal law. So that would preempt the ordinance not only as to Qwest but as to everyone in the marketplace. I think it's very, very nice of Qwest to undertake to represent these other companies who aren't here in challenging this ordinance which on its face doesn't apply to Qwest. Well, Your Honor, Qwest is not here on behalf of anyone other than itself and it's not here out of goodwill for other companies. It's here because the city of Tucson has constantly over the last five years, until we were ready to reach the merits, attempted to apply this ordinance to Qwest. In this case, the city's 30 v. 6 witness testified that the ordinance applies to Qwest. Qwest was in violation of the ordinance which triggers criminal and civil penalties under the ordinance and that Qwest should have to pay the fee. Now, Mr. Van Eaton will stand up here and say, well, we amended this and we don't intend to apply it in the future. But that gives Qwest no finality and it leaves a discriminatory two-tiered system on the books in the city of Tucson. I want to address What's your best case for the proposition that we have the power to disregard something that's a last-minute litigation tactic that stands in the form of legislation that looks on its face otherwise valid? I think two good cases are Jacobus and Friends of the Earth. The Noah Tutt case, which the city relies on, involved an amendment that occurred prior to the litigation, not after the litigation. And these cases stand for the proposition that it's Tucson's heavy burden to show that this dispute will not arise again and that these kinds of last-minute litigation tactics are generally not tolerated. The WT Grant case Are you talking mootness now? Is this what you're talking? Yes. Exactly. Well, Jacobus wasn't moot because there was literally a letter threatening prosecution under the old statute. And in this case, I guess I would say, Your Honor, that while we don't have a letter threatening prosecution, we have the fact of an earlier lawsuit, as this court found, that was designed to compel compliance with this ordinance and a failure to respond to our request for assurance. So I think that's why I highlight the procedural posture of the case, as I do. The trial court's ruling on 191070 fees of 3.5% that Quest pays today as being subject to the Tax Injunction Act is really a ruling of first impression across the country. No court, to my knowledge, has ruled that fees which are specifically denominated in the ordinance as fees for use of the right-of-way in the case of 191070A2 are subject to the Tax Injunction Act or Section 601. Courts have ruled many times on the merits of these fees and the legitimacy of such fees under Section 253. And in this case, if you look at the language of A2, you can see that the fee is a quid pro quo in exchange for use of the right-of-way. In fact, a cellular company who uses 800 feet of Tucson's right-of-way is not subject to the 1.5% fee under 191070A2. If they use 1,100 feet of the right-of-way, that fee kicks in. And that fee is credited toward the franchise application fee that is due under the Telecommunications Ordinance. We have in the record, I think, a useful affidavit of Professor Hellerstein, who is a leading state and local tax expert who captures both the language of the relevant ordinances as well as the legislative history, where in documents internally the city said, this is a rent being imposed pursuant to the city's monopoly power in its proprietary capacity to extract rents from franchise telecommunications providers. Do you think the district court shouldn't apply the BIDART test to determine whether or not these fees were really taxed? Exactly right, Your Honor. I think that that was error. I think there is a much more fundamental question that precedes the application of the BIDART test, and that is, as Professor Hellerstein points out, is this a quid pro quo, the payment in exchange for a benefit to the telecom provider? It's very difficult to look at the language of 191070A2 and conclude that it's anything other than a quid pro quo because it says that it does not apply to a telecom provider who's providing service today, who uses less than a thousand feet of the right-of-way. It is tied very plainly by the language to not only the use of the right-of-way, but to a substantial use of the right-of-way. And I think the trial court relied on the Arizona Court of Appeals decision, which analyzed whether these 191070 charges were under state law transaction privilege taxes, under that state's unique definition of telecommunication service. But as Professor Hellerstein points out, that doesn't answer the question under federal law. And this issue is governed by federal law. And the fundamental question is, is this a tax under federal law, or is it a quid pro quo in exchange for payment of the fee? Unless the court has further questions, I'd like to reserve the remaining portion of my time. May it please the court. My name is Joseph Van Eaton. I'm here representing the city of Tucson. I will address the tax issue, the mootness issue, and then a question raised by the brief of quest, but not by the oral argument as to what would happen if you disagreed with the city's position on either of those issues in this case. The tax issue, there seems to be agreement on this point. If the fees here are a tax, they may not be preempted because section 601 of the Telecommunications Act bars preemption of state or local laws pertaining to taxation. What you heard from quest was, they don't challenge the court's BIDART interpretation. They claim BIDART should not apply. And that the question here is whether there is a quid, whether these taxes are in fact a quid pro quo for use of the rights of way. Now let me tell you, there is no way to find that these fees are a quid pro quo for use of the rights of way. There are two parts to the taxes here, which appear at 19-1070, are part of an article of the Tucson Code called the Public Utilities Tax that was first adopted in 1967. It doesn't just apply to telecommunications providers, although this section does apply only to telecommunications service providers. It actually imposes taxes on a number of utilities. The purpose of the provision is stated in 19-1000. It says it's for the purpose of raising revenue for the city of Tucson, period. The purpose stated in the statute is obviously the most relevant factor in determining whether this is a quid pro quo. And on its face, the statute says it's for raising revenue, not a quid pro quo. If you turn to the taxation, the provisions they're referring to, 19-1070A1 imposes a 2% transaction privilege tax, doesn't even mention rights of way. And in fact, the record shows it applies to people who do not use the right of way, like wireless providers. There is a second part, which imposes an additional 1.5% transaction privilege tax on that class of telecommunications service providers who use the rights of way. But the fact that it falls on that class doesn't make it a quid pro quo. The question you've got to ask is, is the payment made in return for the grant of a right to use the rights of way? And the answer to that question is no. Quest does not contend that if it fails to pay the tax, it loses its statewide grant that it's claiming. It doesn't contend... Well, that is an issue we raised at the beginning of the case. But at the point, at the state of the case we were in, where we've come in and essentially affirmed the validity of the tax, I think there is case law that suggests that it can be heard by the federal court. We have to decide whether or not it's a tax or a fee. That's correct. Sort of like we have jurisdiction to determine our jurisdiction. Well, it's also because we came in and actually said, we've made an affirmative case asking for a declaration that these are taxes. So that's something that once we've done that, the court can hear the issue. Then the tax injunction act doesn't apply, it's really just whether it's preempted or not. That's correct. So in this case, the fact that it falls on a class of providers simply doesn't make it a quid pro quo. Nobody gets anything in return for paying the 1.5%. They don't get a right to use the rights-of-way in any respect. And the distinction has actually been clear between a tax that falls on a class of providers using the rights-of-way and a franchise fee, or rent, where there's a grant attack. Since the 1880s, the Supreme Court first dealt with this case in a case called St. Louis v. United Railway. And it said, you know, it's a clear distinction. If this is attacked involuntarily and there's no rights that are granted in conjunction with it, it's just not a quid pro quo. It's not a rent. And that's the case here. So they should... These are taxes. And by the way, the court doesn't even have to stumble through the record here. Why? Because despite what Mr. Goodnight says, the state... You mean you relieve us from our usual responsibility? Your usual responsibility becomes a little bit easier here because there was a state court decision not just on whether these were valid transaction privilege taxes under Arizona law, but on certain factual issues which underlie this case. The factual issues the court below found, and Quest hasn't appealed this determination, are such that Quest is collaterally stopped from challenging them. And the two that are important here is the state court found these fees are not for use of the rights-of-way, and these fees were adopted pursuant to the taxing authority, not the proprietary authority, which is the authority under which one would impose a rent. What's your next point? Second point, on the mootness issue. We all agree 7B does not apply to Quest. Quest is trying to bring this in under the voluntary cessation exception to the mootness doctrine. This is not a case of voluntary cessation. When we brought the Coloranto case, which did not, by the way, demand that Quest comply with 7B, it actually asked that Quest be required to apply for a franchise under the Arizona State Constitution and under the city charter, neither of which are being challenged here. Under that suit, Quest didn't say, we've been trying to enforce 7B against them. It actually came in and alleged the reverse, that the city had never, ever interfered with Quest operations in the city of Tucson because Quest didn't have a license or franchise under 7B. And keep in mind that that case was filed, the Coloranto action occurred five years after 7B was first put into force. So this is not a case where we ceased any action. This is a case where the judge below said, I don't see any efforts by the city, couldn't point to any true efforts by the city to enforce 7B against Quest. He was concerned because the law on its face appeared to apply to Quest. And he indicated in his order that if we eliminated that, there would be no problem here. And that made sense because there's actually a state law, 9582E, which says we don't have a right to require somebody who already has a state grant. So you did. So we did. We complied with the state law. You're really hiding very cannily in the weeds. And because you won't stipulate that the territorial franchise is valid, that means that as soon as the coast is clear,  No, the point of the amendment and the point of the existence of their claim of the statewide territorial franchise is that until that issue is resolved, we can't apply 7B to them. As long as they've got that claim outstanding. So I hear you saying there is a live issue as to whether their territorial franchise is valid. There is an issue that's unresolved, but what the Coloranto case says is, we can't bring that issue independently. So there is no way for the city to attack Quest franchise grant. It is conceivable the state might try to revoke it. It is conceivable that somebody else might attack it, but we can't bring it. And what makes a case speculative or moot is that you're removed from the immediate Damoclean sword. There's no sword here. There's no prospect 7B. Who had any interest in bringing such a suit? Well, it's very interesting because the issue of Quest territorial franchise was actually an issue in a case involving GST that came up before this court and was declared moot by the Court of Appeals because GST settled with the city. So the interesting thing is Quest is actually trying to have it both ways. It's trying to essentially attack a franchise, the city's franchise ordinance, which now benefits GST because it allows GST to use our rights away. It doesn't affect them. Striking down 7B doesn't do anything or change any Quest behavior or any city behavior with respect to Quest, but it certainly meshes up GST, and it puts GST in a position where it can never challenge. If we accede to the territorial franchise, the question is, how then does GST come in and say, you know, this territorial franchise is a problem under 253? It's an oddity here to see Quest defend its position on the ground that its territorial grant violates section 253, but they want us to at the same time agree that we will never challenge it, never raise the issue, and essentially get this court to endorse it. It's an odd conflict here, and it's certainly one that ought not to defeat any claim of mootness because one of the things that is absolutely the case is the statewide franchise is not at issue in this case. It's not at issue. They explicitly took it out of issue. They protested when we even mentioned the issue, and the court below said the statewide franchise is not at issue. So they're telling you that to get out of this case, we don't just have to tell them we won't apply 7B, which is really the thing that's being attacked. We have to agree to an issue that's not even in the case. I know of no mootness case that stands for the principle that we have to give them something that's not even at issue to moot a case. So your position basically is that Kremens v. Bartley tells us that it's over. It's over. This case is over. Now, I do want to make one other point with respect to the ‑‑ and that is that even if you were to find that this fell within the voluntary cessation exception, there are two things that should lead you to declare this case moot. One is the fact that there is a state law. This is not a case where the city is acting on its own. It is applying, conforming its law to a state law that prevents us from franchising West. That fact makes it pretty ‑‑ makes it certain that we are not going to change back because state law prohibits us from doing that. We've always acted consistently with that. The second thing is that as you alluded to, well, as was sort of alluded to in your colloquy with Mr. Goodnight, the real parties in interest here are not Quest but the other providers, some of whom have settled with the city and are now working happily under Chapter 7B. This is not a case where invalidating 7B helps those people. It leaves them without a franchise or a license to use the rights of way, and they have no claim under the ‑‑ that they have a preteritorial grant. They need authority to be in the rights of way. So in this case, undoing 7B does them no benefit. They're certainly not here. And to issue relief that's really designed not only to defend principles of standing, but you ought to be cautious here because I think it creates some real problems in terms of competition in the Tucson market. The last issue is what if you find for some ‑‑ if you find that you should reach the merits as Mr. Goodnight is essentially urging. What Mr. Goodnight is urging in his brief is for you to go through what is a fairly extensive record and decide this case on the merits. And obviously we don't think you reach the merits here. But even if you wanted to, this would be a case where you would need to remand to the district court. The fact is that in Auburn, which is the case he relies on for the idea, this court should decide things on the merits, this court recognized that in exceptional circumstances it might be appropriate to decide the merits without sending it back to the district court case. In the exceptional circumstances there were, you had an immediate threat to entry. You had a statute where everyone agreed it could be applied on its face and there was nothing else that needed to be looked at. You had no policy or record of what the impact of that was, so there were no additional facts to be looked at. And there was no dispute as to any claims being made in the record. In this case, none of those things are true. We have consistently contended that 9582, that our statute, 7B, and again, I distinguish between 191070, the tax provisions, which were adopted beginning in 1967 and then amended over the course of about 30 years, are completely different than 7B, which was adopted in 1985. By the way, when Quest says that we have a provision that says 191070 was adopted as rent, that's not true. What he's referring to are provisions of a memo that applied to a completely different provision of the Tucson City Code, Section 7C, which has been repealed. But that's an example of the sort of issues we have here. Excuse me. With respect to the 7B itself, our position has been that our authority under 7B is constrained by two things. One is Arizona state law, 9582 and 9583, and the other is case law, which says essentially the exercise of our authority has to be conformed to state and obviously federal law. So the way we interpret our law is any discretion given to us is limited or confined to the bounds of our authority under both state law and obviously under federal law. This is not a case where we claim a right to act in violation of the Telecommunications Act. So this is also not a case where you can decide the issue based on just reading the law. We actually have a record of application, and what they're asking you to do is say read the law and imagine a worst-case scenario. What could they do with this? So, for example, they complain our applications are burdensome. They're not. We have a very simple application. I think it's one or two pages long, and there's no problem filling it out. We've never denied a franchise or a license to anyone who's requested it. That record and the policies of application are obviously relevant to the interpretation. That's something that you would have to go through in order to resolve this case. This is obviously also coming up on a summary judgment motion, and unlike the Auburn case, we have about 20 pages of I think we've got a total of something on the order of 20 statement of facts in this record. If you took all the statement of facts that we presented, you could not resolve this case in favor of Quest because we show that there's been no prohibition, that there's no likelihood of prohibition, and no material impact on Quest. Very unlike Auburn. Very unlike Auburn. With that, I will stop and turn this over to Mr. Irving. Irving? Yes. May it please the Court, I'm Tom Irving representing Nogales Globe in Miami. We feel like we're three little mice in a room full of elephants with two big elephants and they're dancing. As Globe, Miami, and Nogales didn't even come up in Quest's argument. In response to the Court's question of what's this all about, we think it's about, it's obviously a collateral attack on Tucson's state court tax judgment, but it's also about deterring small cities from taxing Quest because cities don't act knowing that they're into a perpetual litigation machine, which is what this has turned into as we look at the cases and see the same parties, same council litigating over and over again over the same issues. Because in this case, none of the cities I represent have a telecommunication ordinance. They have sales tax ordinances that tax businesses and their communities. And this court in Portland at page 1242 questioned whether or not 253 even applies if it's just a general sales tax ordinance. And we suggest this is the time to answer that question and say it doesn't because this is just a general sales tax ordinance. And that when the court questioned saying, well, Quest, wait, Auburn can't go so far as to apply 253 to a general sales tax ordinance, this court should accept this case as the way to answer that question and stop this perpetual litigation machine. My cities, they've had the phone company. All it has to do is have been there prior to February 14th, Valentine's Day, 1912, when Arizona became a state. And everybody knows that the phone company was there. The state of Arizona passed a statute. Quest never asked for anything. They just sued. They just sued because it makes it less apparent that this is a collateral attack on Tucson's state court judgment. So what we have here is we haven't conceded anything on the state court grant. We've always acknowledged state law applies. We've always acknowledged Quest has been there and its predecessors for over 100 years. But yet we're in this case. The tax of business defines businesses. So what Quest points to here is the definition of businesses, not right-of-way fees. This is just how businesses are defined. And there is no quid pro quo. And as we pointed out in our papers, we look at what has been prohibited. It's all imaginary because transfer doesn't apply. It doesn't apply. Pre-statehood grant. Audits all relate to sales tax. Most favored city and in kind doesn't apply, don't exist. Nogales has a charter provision that says if the state of Arizona deregulates all utilities in Arizona, Nogales reserves the right to regulate. Well, gosh, is the state of Arizona going to eliminate its public utilities commission? Not likely. Elections. There's no elections, no franchise. Discretion. The discretion thing just proves the point here because Nogales can revoke a franchise. There's no franchise. Globe. What Quest complains about is if in a sales tax filing, Quest commits fraud, it can be investigated. They want you to abolish that provision. That's at tab three of appellant's opening brief. But the best, showing how these little cities aren't really part of this case, is section 10 of the Miami ordinance passed in 1964, sales tax ordinance. And what Quest wants this court to abolish, and that's at tab five of appellant's opening brief, is the sentence, any person, partnership, firm, or corporation applying for a license as an agent, salesman, solicitor, peddler, or drummer can have its license revoked. That bothers Quest. So is Quest an agent? No. Salesman? No. Solicitor? No. Well, Quest must be a peddler or a drummer because they want this court to take an ordinance that only applies to peddlers, drummers, and say the Telecom Act of 1996 abolishes it. That's crazy. And these little cities shouldn't be in this case. We have sales tax ordinances. We do not have telecommunication ordinances, and there is no ripeness. It's moot. The BIDAR test applies and should apply here. And the statement that this court made in Portland, saying that Auburn doesn't reach far enough to apply 253 to general city ordinances, this is a good case to say, yeah, don't have any more of these lawsuits. Thank you.  You have some rebuttals, huh? Page 1131 of this court's decision, Judge Trott's opinion, says that, and this is the Ninth Circuit, ultimately the Ninth Circuit appeal from the Quo Warranto action, Tucson alleges that Quest is illegally usurping and continues to illegally usurp the franchise for use of the rights of way of the city of Tucson for the transaction of its business. The franchise is a grant of the right to use public property in a particular way, and Tucson's Quo Warranto action asks, by what authority is Quest using public property? Tucson's objective in bringing this action was to force Quest to apply to use and pay for its use of the public rights of way in the city of Tucson. And they were unsuccessful? Yes, on procedural grounds. And as Mr. Van Eaton points out and acknowledges, Your Honor, the issue of whether Quest, in fact, has a pre-territorial grant has never been resolved. Nothing has changed in the sense that Quest has always contended that it has such a grant, and Tucson has always denied that it has such a grant. So it's not in this case to make that determination? No, Your Honor. It's not an issue? It's not a case, not a controversy, not before us? That issue is... Why doesn't the Kremen case tell us that you've got an ordinance here? It's not just a voluntary cessation of a practice, but it's a valid ordinance, and I've rendered this case proof. Because there is no finality to this ordinance. I agree with Mr. Van Eaton that the issue of whether Quest has a legitimate and valid statewide grant is not in this case. It's not before the court. This was brought to preempt the Tucson ordinance under federal law. But the amendment was obviously a litigation tactic and is in no sense final. Mr. Van Eaton made the point that the right-of-way fees were revenue-raising. That's always true. Cities across the country have refused to relinquish the power they historically had. Do you accept that BIDAR is the test we ought to apply to this situation? No, we don't accept that, Your Honor. I don't see how you escape BIDAR. Explain that to me. Well, I think the initial fundamental question is whether or not these fees are being imposed by Tucson in its proprietary capacity rather than a regulatory capacity in exchange for use of the right-of-way exacting a rent. And we believe the legislative history and the language makes it clear that that's the case. But I make the point that it doesn't answer the question to say that right-of-way fees are revenue-raising. Cities are making millions of dollars a year in a city like the city of Tucson. You're talking about the difference between 2% and 3.5% is millions of dollars annually. And that ultimately is a cost that gets passed on through rate regulation to Quest customers. That's who ends up paying these fees. It makes it more difficult for Quest to deploy services and improve services in rural areas. That's what this fight is about. And what the city wants to do, what it's continually attempted to do, is to extract 5% of gross revenues, raising revenue for its own benefit from Quest and other companies. What about general sales tax ordinances? Moving to the small cities who don't belong there. Yeah. The ordinances that we have challenged as to the small cities are ordinances, as Professor Hellerstein points out and as we quote, that contain language saying that this is a fee for use in one case, for example, of the city's streets, alleys, and highways. On its face, a fee for use of the rights-of-way. Not a generally applicable tax, but a fee in exchange for the use of the city's streets, alleys, and highways. Is that provision found in all three cities' codes? I believe in two of the three there's language right in the code provisions that ties the fee to use of the city's streets, alleys, and highways. But we've quoted the language in the record, Your Honor. Mr. Van Eaton obviously acknowledged in response to your questions that the issue of the statewide grant has not been resolved. There is no difficulty if this court strikes down this ordinance. The city of Auburn was a 12C case. I was counsel in that case in the city of Portland. And city of Auburn, the federal district judge, held that the case wasn't right. And Judge McEwen said, I'm going to decide this on an appellate record on a 12C standard. It wasn't even cross motions for summary judgment. And the court ruled, I can decide this as a matter of law. But also Judge McEwen spelled out very carefully why that was the case and the circumstances, which seems pretty different from what we have here. Your Honor, it is not different. The Tucson ordinance, which was passed prior to the act, is a classic pre-253 ordinance that in many established ways runs afoul of Section 253 in just the same way that city of Auburn held. And this can be decided on an appellate record as a matter of law. It's significant.  Thank you, Your Honor.
judges: Trott, T.G. Nelson, Paez